IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **STEVEN MALINOWSKI,** *et al.***,** | * | |
| Plaintiffs | * | |
| v. | * | CIVIL NO. JKB-14-917 |
| **THE LICHTER GROUP, LLC,** | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Steven Malinowski, James E. Miley, Ray Dotzler, Andrew L. Frantz, and Wayne P. McMillen (collectively, "Plaintiffs"), citizens of New York and Pennsylvania and former employees of Trojan Horse, Ltd. ("Trojan Horse"), brought a proposed class action in diversity against The Lichter Group, LLC ("LGLLC" or "Defendant"), a limited liability company organized under the laws of the State of Maryland.[1] Plaintiffs accuse Defendant of negligent misrepresentation and professional negligence under Maryland law, in relation to certain auditing services that Defendant provided in 2011 and 2012.

Now pending before the Court is Defendant's Motion for Summary Judgment (ECF No. 41), filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also pending are Plaintiffs' "Motion Pursuant to FRCP Rule 60(b)(1)" for reconsideration of the Court's Order of August 26, 2015 (ECF No. 50)[2] and Plaintiffs' Motion for Class Certification (ECF No. 53). The issues have been briefed, and no hearing is required, *see* Local Rule 105.6 (D. Md. 2014). For

---

[1] Also named as defendants in Plaintiffs' original Complaint were Ascensus, Inc.; Cambridge Investment Research, Inc.; and the Trojan Horse, Ltd. 401(k) Plan. These parties were terminated pursuant to the Court's Orders of February 26, 2015 (ECF No. 31) and March 25, 2015 (ECF No. 40).
[2] For clarity, the Court will refer to ECF No. 50 throughout this Memorandum as Plaintiffs' Motion for Reconsideration.

the reasons explained below, Defendant's Motion will be GRANTED, and Plaintiffs' Motions will be DENIED.

## I. Overview

### A. *Factual Background*[3]

Plaintiffs are former employees of Trojan Horse, a United States Postal Service transportation contractor. (ECF No. 38 ¶ 17.) Plaintiff Malinowski was employed as a manager at the Trojan Horse facility in Bethpage, New York; the remaining Plaintiffs were employed as truck drivers. (*Id.* ¶¶ 4-13.) In 2009, Trojan Horse established the Trojan Horse, Ltd. 401(k) Plan ("the Plan") (*id.* ¶ 20), an employee benefit plan governed by the Employee Retirement Income Security Act ("ERISA") of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.* Pursuant to section 103 of ERISA, employee benefit plans are subject to detailed reporting requirements: an annual report must be filed with the Department of Labor ("DOL") and furnished to plan participants. 29 U.S.C. § 1023(a). The annual report must be accompanied by a financial statement and the written opinion of an independent qualified public accountant, "who shall conduct such an examination . . . as the accountant may deem necessary to enable the accountant to form an opinion as to whether [documents included with the annual report] are presented fairly in conformity with generally accepted accounting principles." § 1023(a)(3)(A). Defendant here was retained to perform such an audit of the Plan's financial statements for the years ending December 31, 2009, 2010, and 2011. Defendant's audit reports were attached to the Plan's

---

[3] The facts and the inferences to be drawn therefrom are taken in the light most favorable to the party opposing summary judgment—in this case, Plaintiffs. *See Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

annual submissions, which, pursuant to 29 C.F.R. § 2520.103–1, included Form 5500 "Annual Return/Report of Employee Benefit Plan" and accompanying schedules.[4]

The thrust of Plaintiffs' Amended Complaint is that Defendant's audit reports for 2010 and 2011 contained material omissions regarding Plan contributions/arrearages and the Plan's fair value and that the audits "failed to adhere to generally accepted auditing standards." (ECF No. 49 at 2.)[5] By year-end 2011, Trojan Horse's employer contributions were several quarters behind, such that the company owed over $700,000 to the Plan. (ECF No. 13–11 at 7, 9.) Plaintiffs believe that Defendant's audit reports did not accurately reflect this deficiency; they further contend that the reports "were required to . . . put the DOL or . . . participants on notice of any irregularities in . . . accounting and compliance." (ECF No. 38 ¶ 78.) Thus, although Plaintiffs make no suggestion that Defendant *itself* converted or misdirected the subject funds, they nevertheless believe Defendant is responsible for the losses they apparently sustained.[6]

Plaintiffs propose a class defined as follows:

All present and former truck drivers, managers and supervisors employed by TROJAN HORSE, LTD, who were participants in the Trojan Horse Ltd. 401 (K) [*sic*] Plan . . . and sustained economic loss during the applicable statutory period, as a result of [Defendant's] negligent misrepresentations and professional negligence in acting as the Plan auditor. (*Id.* ¶ 33.)

---

[4] In their Amended Complaint, Plaintiffs allege that Defendant "prepared and approved Form 5500 for Plan years 2009, 2010 and 2011." (ECF No. 38 ¶ 26.) Defendant vigorously disputes this assertion (ECF No. 35 ¶ 33), and there is no evidence in the summary judgment record to support it. On the contrary, in letters of understanding signed by Traci A. Vreeland-Rate, a principal at LGLLC, and Brian Hicks, the Plan's administrator, Ms. Vreeland-Rate recounted that the Plan had "not engaged [Defendant] to prepare or review the Plan's Form 5500 filing[s]" but that "the audited financial statements of the Plan are required to be filed with the Form 5500" and that "[p]rofessional standards require that [Defendant's agents] read the Plan's Form 5500 prior to its filing" to check for any material inconsistencies between the form and the financial statements. (ECF Nos. 13–6 at 4 & 13–9 at 4.) Ms. Vreeland-Rate stressed that this procedure was "not sufficient nor is it intended to ensure that [Form 5500] is completely and accurately prepared." (*Id.*)

[5] The particular errors that Plaintiffs believe they have detected will be addressed below, as relevant, in relation to Defendant's Motion for Summary Judgment.

[6] In a separate action pending in this District, the DOL brought suit against Brian Hicks, Trojan Horse, and affiliates for breach of fiduciary duty in connection with Plan contributions and distributions. *See* Complaint, *Perez v. Hicks*, Civ. No. ELH-15-1097 (D. Md. Apr. 16, 2015). All defendants in that separate action had defaulted for lack of answer or defense as of January 6, 2016.

B.   *Procedural History*

Plaintiffs filed an initial Complaint on March 25, 2014, alleging that Defendant breached its fiduciary duties and engaged in prohibited transactions under ERISA. (ECF No. 1 at 16-17.) Thereafter, Defendant filed a Motion to Dismiss (ECF No. 13), and Plaintiffs filed a Motion for Leave to File an Amended Complaint (ECF No. 24). In a pair of Memorandum Opinions dated February 26, 2015, and March 11, 2015 (ECF Nos. 30 & 33), United States District Judge William D. Quarles, Jr., narrowed Plaintiffs' action to a single count sounding in negligence; thereafter, Plaintiffs filed a conforming Amended Complaint. (ECF No. 38.)[7] On March 25, 2015, Judge Quarles entered a Scheduling Order, setting deadlines for, *inter alia*, Rule 26(a)(2) disclosures and the close of discovery. (ECF No. 39.)

On July 17, 2015, Defendant filed the pending Motion for Summary Judgment. (ECF No. 41.) Shortly thereafter, Plaintiffs filed a Motion Pursuant to Rule 16[(b)(4)] for an Order Modifying the Scheduling Order. (ECF No. 42.) On August 26, 2015, Judge Quarles granted in part and denied in part Plaintiffs' Motion, extending the deadlines for discovery and requests for admission by sixty days but declining to extend the deadlines for Rule 26(a)(2) disclosures. (ECF No. 48.) On September 3, 2015, Plaintiffs filed a response in opposition to Defendant's pending summary judgment motion (ECF No. 49), to which response Defendant later replied (ECF No. 52). Also on September 3, Plaintiffs filed a Motion for Reconsideration of Judge Quarles's Order of August 26 (ECF No. 50); Defendant opposed reconsideration (ECF No. 51). Finally, on October 7, 2015, Plaintiffs filed a Motion for Class Certification (ECF No. 53); that

---

[7] Although Plaintiffs identify only one count in their Amended Complaint, that count encompasses two distinct theories—one for negligent misrepresentation, the other for professional negligence. The Court will address both theories below.

Throughout their Amended Complaint, Plaintiffs repeatedly accuse Defendant of "knowingly ma[king] material negligent representations." (ECF No. 38 ¶¶ 56, 68-72.) It is, of course, impossible to *knowingly* make a *negligent* representation; moreover, the Amended Complaint contains no fraud count, and there is certainly no evidence in the summary judgment record to suggest that Defendant or its agents committed knowing misconduct. The Court will thus confine its analysis to the negligence theories that Plaintiffs pleaded.

Motion is fully briefed (ECF Nos. 55 & 56).  The case was transferred to the undersigned on January 14, 2016, and the pending Motions (ECF Nos. 41, 50 & 53) are ripe for decision.

## II.	*Plaintiffs' Motion for Reconsideration (ECF No. 50)*

In their Motion for Reconsideration, filed pursuant to Rule 60(b), Plaintiffs ask the Court to reassess Judge Quarles's August 26, 2015, decision, to the extent that Judge Quarles declined to modify the deadline for rebuttal Rule 26(a)(2) disclosures.

Rule 60(b) provides that "[o]n motion and just terms, the court may relieve a party . . . from a final judgment, order, or proceeding" for, among other reasons not applicable here, "mistake, inadvertence, surprise, or excusable neglect."  As the Court of Appeals for the Fourth Circuit has recognized, the Rule 60(b) remedy is "extraordinary" and should only be granted in "exceptional circumstances."  *In re A.H. Robins Co.*, 166 F.3d 1208, 1998 WL 904717, at *1 (4th Cir. 1998) (per curiam) (unpublished table disposition); *see also Ngatia v. Dep't of Pub. Safety & Corr. Servs.*, Civ. No. WDQ-14-0899, 2015 WL 7012672, at *3 (D. Md. Nov. 12, 2015) ("[W]hen a Rule 60(b) 'motion does not raise new arguments, but merely urges the court to "change its mind," relief is not authorized.'" (quoting *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 470 (D. Md. 2002), *aff'd*, 86 F. App'x 665 (4th Cir. 2004))).  Before a party may secure relief under any of Rule 60(b)'s enumerated grounds, the party "first must show 'timeliness, a meritorious [claim or ]defense, a lack of unfair prejudice to the opposing party, and exceptional circumstances.'"  *Dowell v. State Farm Fire & Cas. Auto. Ins. Co.*, 993 F.2d 46, 48 (4th Cir. 1993) (quoting *Werner v. Carbo*, 731 F.2d 204, 207 (4th Cir. 1984)).

Assuming Plaintiffs' Motion is timely, and putting to one side the question of unfair prejudice, Plaintiffs have not demonstrated exceptional circumstances such as would warrant Rule 60(b) relief.  Plaintiffs contend that they were unable to comply with the original July 7,

2015, deadline for rebuttal Rule 26(a)(2) disclosures because defense counsel did not reveal the identities of Defendant's auditors until May 19, 2015, and because it took additional time to arrange the depositions of these auditors. (ECF No. 50–1 at 5.)[8] Plaintiffs add that Defendant's expert-witness disclosures, which it served on June 23, 2015, did not comport with the requirements of Rule 26(a)(2)(C), and that Plaintiffs were thus "effectively precluded from providing fully responsive and meaningful . . . rebuttal disclosures." (*Id.* at 7.) [9] Assuming *arguendo* that the delays to which Plaintiffs allude were beyond their control, and assuming further that Defendant's witness disclosures were legally insufficient, Plaintiffs should have filed *timely* motions to extend the dates and deadlines in the Scheduling Order and to compel adequate disclosures. Instead, Plaintiffs waited until July 31, 2015—more than two months after Defendant revealed the auditors' identities, more than a month after it provided its witness disclosures, and over three weeks after rebuttal disclosures came due.[10] At no point, either in their underlying Rule 16(b)(4) Motion before Judge Quarles or in their Motion for Reconsideration pending before the undersigned, have Plaintiffs proffered a reasonable explanation for their tardiness.[11]

---

[8] Plaintiffs presented an identical argument in their original Rule 16(b)(4) Motion (ECF No. 42–1 at 5-6). For that reason alone, the argument is improper at this stage: Plaintiffs are simply asking the Court to change its mind. *See Ngatia v. Dep't of Pub. Safety & Corr. Servs.*, Civ. No. WDQ-14-0899, 2015 WL 7012672, at *3 (D. Md. Nov. 12, 2015).

[9] Plaintiffs separately contend that denial of Rule 60(b) relief would "preclude Plaintiffs from proving their case of professional negligence . . . by competent expert opinion and would be tantamount to a dismissal of the Complaint." (ECF No. 50 at 2-3.) This contention corresponds to Defendant's first of two principal arguments in support of its Motion for Summary Judgment and will be addressed in Part III.C, *infra*.

[10] For that matter, Plaintiffs made no mention of Defendant's expert-witness disclosures in their Rule 16(b)(4) Motion; they only raised that particular concern in their Motion for Reconsideration, filed on September 3, 2015.

[11] Thus, not only have Plaintiffs failed to demonstrate exceptional circumstances under Rule 60(b), they have also failed to demonstrate good cause pursuant to the case law that has developed around Rule 16(b)(4) and that would have informed Judge Quarles's prior analysis. *See Rassoull v. Maximus, Inc.*, 209 F.R.D. 372, 374 (D. Md. 2002) ("Because a court's scheduling order 'is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril,' a movant must demonstrate that the reasons for the tardiness of his motion justify a departure from the rules set by the court in its scheduling order." (quoting *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D. Md. 1999))); *see also Potomac Elec.*, 190 F.R.D. at 375 ("Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.").

In any event, as will become clear in Part III.C, *infra*, Plaintiffs have failed to advance a meritorious negligence claim, and Defendant is therefore entitled to judgment as a matter of law. Reconsideration of Judge Quarles's prior Order would thus be futile, and accordingly, Plaintiffs' Motion for Reconsideration (ECF No. 50) will be DENIED.

## III.     *Defendant's Motion for Summary Judgment (ECF No. 41)*

### A.   *Standard of Review*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *Celotex Corp.*, 477 U.S. at 322-23. The "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of his pleading but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1).[12] Supporting

---

[12] In their opposition memorandum, Plaintiffs propose to turn this standard on its head, arguing that Defendant was "required, in support of its [M]otion for Summary Judgment, to submit an affidavit of an expert, opining that either (a) [Defendant] was not negligent in performing the audits or (b) [Defendant's] performance of the audits were [*sic*] not a proximate cause of the economic injuries sustained by Plaintiffs." (ECF No. 49 at 5.) But that is not the law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[W]e find no . . . requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." (emphasis in original)); *accord Pleasurecraft Marine Engine Co. v. Thermo Power Corp.*, 272 F.3d 654, 658 (4th Cir. 2001); *Brown v. Siemens Healthcare Diagnostics, Inc.*, Civ. No. DKC 11-0769, 2012 WL 3136457, at *5 (D. Md. July 31, 2012) ("Where the plaintiff has the ultimate burden of proof at trial, as in the present case, a moving defendant is

and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

### B. *Choice of Law*

"A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). "In cases sounding in tort, Maryland applies the maxim of *lex loci delicti*—the law of the place of the harm—to determine the applicable substantive law." *Young v. Swirsky*, Civ. No. GLR-14-3626, 2015 WL 6501164, at *6 (D. Md. Oct. 26, 2015) (citing *Hauch v. Connor*, 453 A.2d 1207, 1210 (Md. 1983)); *see also Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 511 (4th Cir. 1986) ("The place of injury is the place where the injury was suffered, not where the wrongful act took place.").

In this case, Plaintiffs allege that Defendant is liable for negligence "under Maryland state law." (ECF No. 38 ¶ 1.) There is certainly no dispute that Defendant is organized under the laws of Maryland, and the Court assumes (although the record on this point is not clear) that Defendant's agents performed the subject auditing services at Defendant's Baltimore, Maryland, offices. That said, as Judge Quarles noted in his March 11, 2015, Memorandum, Plaintiffs are citizens of New York and Pennsylvania; it is thus conceivable that the *loci delicti*—*i.e.*, the "place where the injury was suffered," *Johnson*, 785 F.2d at 511—is one of those states. (ECF No. 33 at 11.) Judge Quarles applied Maryland law at the 12(b)(6) stage, and he warned the parties that, should they neglect to brief the choice-of-law question in later stages, he would

---

required only to show the absence of a genuine dispute of material fact; it need not affirmatively present evidence to maintain a motion for summary judgment."). The absence of an expert affidavit in support of Defendant's position will not preclude the Court from granting summary judgment to Defendant if it is apparent from the record, such as it is, that there is no genuine dispute of material fact and that Defendant is entitled to judgment as a matter of law.

continue to apply Maryland law.  (*Id.* at 12 n.17.)   The parties indeed neglected to brief the choice-of-law question, and the record lacks sufficient evidence from which the Court might settle the question *sua sponte*.

Fortunately, the Court of Appeals of Maryland has fashioned a helpful default presumption for such situations:  "Where the parties to an action fail to give . . . notice of an intent to rely on foreign law . . . a court in its discretion . . . may presume that the law of [an] other jurisdiction is the same as Maryland law."  *Chambco v. Urban Masonry Corp.*, 659 A.2d 297, 299 (Md. 1995); *see also Howes v. Wells Fargo Bank, N.A.*, Civ. No. ELH-14-2814, 2015 WL 5836924, at *24 (D. Md. Sept. 30, 2015) (applying the *Chambco* presumption); *Kent Constr. Co. v. Glob. Force Auction Grp., LLC*, Civ. No. TJS-12-2839, 2015 WL 5315565, at *3 (D. Md. Sept. 10, 2015) (same); *Danner v. Int'l Freight Sys. of Wash., LLC*, 855 F. Supp. 2d 433, 447-48 (D. Md. 2012) (same).

Accordingly, for the purpose of resolving Defendant's Motion for Summary Judgment, the Court will continue to apply Maryland tort law.

### C.   *Analysis*

In its pending Motion, Defendant raises two primary arguments in support of summary judgment.  Defendant's first argument, concerning Plaintiffs' failure to designate an expert witness, is not persuasive.  But Defendant's second argument, concerning tort causation, is dispositive.

Defendant first contends that it is entitled to summary judgment because "Plaintiffs, without an expert, cannot establish that [Defendant] did not perform the financial statement audits correctly and negligently made erroneous statements in the audit reports."  (ECF No. 41–2

at 11.)[13] Defendant is correct that, under Maryland law, "a party is presumed to have acted with due skill and care and a party alleging otherwise bears the burden of overcoming that presumption." *Bd. of Trs. v. Patient First Corp.*, 120 A.3d 124, 135 (Md. 2015). Defendant is also correct that "expert testimony is generally necessary to establish the requisite standard of care owed by [a] professional." *Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1086 (Md. 2010). And as discussed in Part II, *supra*, Plaintiffs neither timely designated an expert nor proffered a legally sufficient justification in support of their Motion for Reconsideration of Judge Quarles's Order of August 26, 2015.[14]

However, late designation of an expert implicates another rule: Rule 37(c)(1). That rule provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e)" may nevertheless use that information or witness *if* the party's failure was "substantially justified *or is harmless*" (emphasis added). The Fourth Circuit has instructed district courts to consider four factors when determining harmlessness under Rule 37(c)(1): "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; [and] (4) the importance of the evidence[.]" *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,

---

[13] Defendant similarly contends that, without an expert, Plaintiffs would be unable to prove their damages. (ECF No. 52 at 20-21.)

[14] For that matter, even had the Court granted Plaintiffs' Motion for Reconsideration, it is not clear how that would have helped Plaintiffs. In both their Motion for Reconsideration and their underlying Rule 16(b)(4) Motion, Plaintiffs sought additional time to serve *rebuttal* disclosures; in neither Motion did Plaintiffs request additional time to designate an expert for their case-in-chief. Given that the burden rests squarely on Plaintiffs to prove that Defendant breached the duty of professional care, *Bd. of Trs. v. Patient First Corp.*, 120 A.3d 124, 135 (Md. 2015), the lack of an expert on direct would seem to doom their case. *See Steele v. Kenner*, 129 F. App'x 777, 780 (4th Cir. 2005) (per curiam) ("A party may not use rebuttal as an attempt to introduce evidence that he should have introduced in his case-in-chief."); *Allen v. Prince George's Cty.*, 737 F.2d 1299, 1305 (4th Cir. 1984) ("Ordinarily, rebuttal evidence may be introduced only to counter new facts presented in the defendant's case in chief[.]"); *accord Noffsinger v. Valspar Corp.*, No. 09 C 916, 2011 WL 9795, at *6 (N.D. Ill. Jan. 3, 2011) ("[A] party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief.").

318 F.3d 592, 597 (4th Cir. 2003).[15] Each of the *Southern States* factors would seem to cut in Plaintiffs' favor: Defendant would not be surprised by the admission of expert testimony, given the motion practice that has already taken place; any prejudice to Defendant could be substantially mitigated with an opportunity for additional discovery; late disclosure would have no bearing on the calendar for a trial that has not yet been scheduled; and expert testimony would be not only "important" but, most likely, indispensable to Plaintiffs' case.

In light of Rule 36(c)(1) and the *Southern States* factors, Plaintiffs' failure to designate an expert does not by itself entitle Defendant to judgment as a matter of law. Fortunately for Defendant, Plaintiffs' case has a separate and far more serious defect: Plaintiffs have not adduced sufficient evidence from which a reasonable factfinder could conclude that Defendant *caused* Plaintiffs' damages. This is so whether Plaintiffs' action is viewed as one for negligent misrepresentation or for professional negligence. Since Plaintiffs reference both causes of action in their Amended Complaint—albeit under a single count—the Court addresses each in turn.

   *1. Negligent Misrepresentation*

A plaintiff asserting a claim for negligent misrepresentation must prove that (1) the defendant, owing a duty of care to the plaintiff, negligently asserted a false statement; (2) the defendant intended that his statement would be acted upon by the plaintiff; (3) the defendant had knowledge that the plaintiff would probably rely on the statement which, if erroneous, would cause loss or injury; (4) the plaintiff took justifiable action in reliance on the statement, and (5) the plaintiff suffered damage proximately caused by the defendant's negligence. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 273 (Md. 2007); *see also Walpert, Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 587-88 (Md. 2000) ("[T]he action lies for negligent words, recovery being

---

[15] A fifth factor—the nondisclosing party's explanation for its noncompliance with Rule 26—"relates primarily to the substantial justification exception." *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003).

permitted where one relies on statements of another, negligently volunteering an erroneous opinion[] intending that it be acted upon[] and knowing that loss or injury are likely to follow if it is acted upon." (quoting *Virginia Dare Stores v. Schuman*, 1 A.2d 897, 899 (Md. 1938))).

Thus, for purposes of Plaintiffs' negligent-misrepresentation theory, it is not enough that Defendant's audit reports may have contained omissions or even misinformation; rather, Plaintiffs must demonstrate that they read and relied on those reports to their detriment. Yet in their Supplemental Responses to Defendant's First Set of Interrogatories, Plaintiffs Dotzler, Frantz, Miley, and McMillen each admitted that they had "no independent recollection" of obtaining, reading, or reviewing the audit reports or Forms 5500. (ECF Nos. 41–5 at 9-10, 41–6 at 9-10, 41–7 at 9-10 & 41–8 at 9-10.) These Plaintiffs elaborated on their nonreliance in their deposition testimony. Plaintiff Dotzler acknowledged that he never requested a copy of a Form 5500 or the Plan's annual financial report, and he noted that he had only learned about LGLLC's role as the Plan's auditor the day before his deposition. (ECF No. 49–3 at 5-7.) Plaintiff Frantz "did not know the name of the auditor" and neither asked for nor received a Form 5500 or the Plan's financial report. (ECF No. 49–4 at 2-4.) Plaintiff Miley had no idea which reports or information may have been presented to government regulators as a result of the audits, and he acknowledged that he had never seen any of the documents prepared by LGLLC. (ECF No. 49–6 at 4, 8.) And Plaintiff McMillen remarked that Form 5500 did not "jog anything in [his] memory." (ECF No. 49–5 at 8.) McMillen added that he never received any audit reports or Forms 5500 from Trojan Horse and that he did not know about LGLLC until 2015. (*Id.*)

Unlike his former colleagues, Plaintiff Malinowski attested to some marginal familiarity with Defendant's auditing work. He recalled that he read the summary annual report for 2010, though he had no independent recollection of how he obtained the report, when he read the

report, or what his understanding of the report's contents might have been. (ECF Nos. 41–4 at 9 & 41–9 at 9.) Malinowski also recalled reading Form 5500 for 2011, though once again he could remember neither when he read the form nor how he obtained it. (ECF Nos. 41–4 at 10 & 41–9 at 10.) Moreover, Malinowski (like his colleagues) was "unable and unwilling to speculate" as to what action he might have taken had the documents contained different information. (ECF No. 41–9 at 12, 14-15.)

Under such circumstances—with four of the five named Plaintiffs having never even seen Defendant's audit reports and one Plaintiff attesting to a recollection that is vague at best[16]—it cannot seriously be contended that Plaintiffs "took justifiable action in reliance on [Defendant's] statement[s]" and suffered damages thereby, *Lloyd*, 916 A.2d at 273. And indeed, in their opposition memorandum, Plaintiffs do not profess to have actually relied on Defendant's reports. Instead, they invite the Court to chart a new course for tort recovery under Maryland law, importing the doctrine of presumed reliance from federal securities-fraud cases, most notably *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Plaintiffs cite no authority in Maryland or in this Circuit for the proposition that a doctrine primarily associated with fraud actions brought under the Securities Exchange Act of 1934 and Rule 10b–5 has any relevance whatsoever to a state-law action sounding in negligence.[17] In fact, in a case involving common-law fraud (a species of action

---

[16] During Malinowski's deposition, when defense counsel showed him the 2011 Form 5500, Malinowski indicated that he had been referring to a different document in his Supplemental Responses to Defendant's First Set of Interrogatories. (ECF No. 55–3 at 2.) Though not entirely clear, it appears from the deposition testimony that Malinowski may have confused Form 5500 with a form he executed when he joined Trojan Horse in 2010. (*Id.*) Malinowski's apparent confusion about which forms he may, or may not, have read, further undermines Plaintiffs' negligent-misrepresentation theory.

[17] A careful read of *Basic Inc. v. Levinson* and *Affiliated Ute Citizens of Utah v. United States* reveals how inapt those cases are to the case at bar. In *Basic*, the Court sanctioned the so-called "fraud-on-the-market" theory as a mechanism to satisfy the reliance element of a Rule 10b–5 action; in so doing, the Court explained that in the modern securities market, where "millions of shares chang[e] hands daily," the market acts as the investor's agent, and the "investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that

more akin to a Rule 10b–5 claim than is a negligence claim), Judge Messitte of this District commented that "[t]he most prominent distinction between common law fraud and a [10b–5] violation is that the latter permits recovery based on a . . . theory which presumes reliance, while the former requires proof of actual reliance." *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 968 (D. Md. 1995); *accord Cofield v. Lead Indus. Ass'n*, Civ. No. MJG-99-3277, 2000 WL 34292681, at *10 (D. Md. Aug. 17, 2000). Judge Messitte added that "[a]s with . . . common law fraud . . . failure to plead actual reliance . . . is fatal to [a] negligent misrepresentation count." *Medimmune*, 873 F. Supp. at 969; *see also Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 235 (Md. 2000) (finding negligent misrepresentation claim unsuitable for class certification because the tort "incorporates reliance as an element of proof" and "reliance will vary from plaintiff to plaintiff").[18]

It is not the proper function of a federal court, sitting in diversity, to expand state tort liability where the state judiciary has given no signal that it would recognize such expansion. Because Plaintiffs have not demonstrated actual reliance on Defendant's audit reports, and because Plaintiffs' theory of presumed reliance has no application here, Defendant is entitled to summary judgment with respect to Plaintiffs' negligent-misrepresentation claim.

### 2. *Professional Negligence*

Although Plaintiffs direct their opposition brief to their misrepresentation theory, in their Amended Complaint they also allege professional negligence. Under Maryland law, a

---

price." 485 U.S. 224, 244, 247 (1988). And in *Affiliated Ute*, the Court looked to the expansive language of the Securities Exchange Act of 1934 and Rule 10b–5 in determining that the sellers of certain stock could recover against bankers who had profited handsomely at their expense and because of their ignorance. 406 U.S. 128, 150-53 (1972). This case, by contrast, involves no public market; no buying or selling of securities; no broad statutory or regulatory language; and no indicia of suspicious profit-taking or affirmative misconduct by Defendant. To extend the reasoning of *Basic* and *Affiliated Ute* to this case would be to drive the proverbial square peg into the round hole.
[18] Plaintiffs insist that the *Affiliated Ute* presumption has "not been exclusively applied in the securities fraud context." (ECF No. 49 at 16.) But significantly, no case cited in Plaintiffs' opposition memorandum or in the subsequent briefing associated with their Motion for Class Certification applies either *Affiliated Ute* or *Basic* to a state-law negligence claim.

professional negligence claim—like any negligence claim—requires the plaintiff to establish "a duty owed to the plaintiff or to a class of which the plaintiff is a part; a breach of that duty; a causal relationship between the breach and the harm; and damages suffered." *Katz*, 762 A.2d at 587. In order to establish the requisite causal relationship, the plaintiff "must show that there is a reasonable probability or reasonable certainty that the act complained of caused the injury suffered. Mere possibility is not enough." *Lustine Chevrolet v. Cadeaux*, 308 A.2d 747, 751 (Md. Ct. Spec. App. 1973); *see also Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 351 (D. Md. 2011) ("Under Maryland law, to satisfy the causation element of their negligence claim, Plaintiffs must show that Defendant's negligence was 'both a cause in fact of the injury and a legally cognizable cause.' . . . Maryland courts consider two tests in determining whether causation-in-fact exists: the 'but for' test and the substantial factor test. The 'but for' test considers whether the injury 'would not have occurred absent defendant's negligent conduct.' . . . Under the substantial factor test, an action is viewed as the cause of an injury only if the action was a '"substantial factor" in bringing about plaintiff's injury.'" (citations omitted)).[19]

The causation element of the prima facie case for negligence poses an obvious problem for Plaintiffs. They do not allege, and they certainly do not demonstrate, that Defendant was directly responsible for their losses; rather, those losses are attributable to ERISA violations (and perhaps outright theft) by their former employer. Nor can Plaintiffs seriously contend that, but for the alleged inaccuracies in the audit reports, they themselves would have somehow taken the

---

[19] Moreover, where, as here, the plaintiff claims economic damages only, "courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent." *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 11 (Md. 2013) (quoting *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 759-60 (Md. 1986) (footnote omitted)). Interestingly, Defendant does not address the intimate-nexus question in its briefing. For the purpose of resolving the pending Motion, the Court therefore assumes—but does not decide—that there is a sufficient nexus between Plaintiffs and Defendant such as would allow Plaintiffs to recover economic damages if the other elements of their negligence claim were satisfied.

initiative to challenge Trojan Horse and stem the tide of losses; as discussed above, four of the five Plaintiffs never even saw the reports, and Plaintiff Malinowski's vague recollection of one or perhaps two documents is insufficient to create a triable question of fact.

In their Amended Complaint, however, Plaintiffs claim that the audit reports served the dual function of placing both Plan participants *and* the DOL on notice of irregularities. (ECF No. 38 ¶ 78.) And in their depositions, Plaintiffs seemed to place blame on Defendant for inadequately informing government regulators (the DOL or perhaps the Internal Revenue Service) of Trojan Horse's misdeeds.[20]

There is no question that one important function of ERISA's annual-reporting requirement, pursuant to 29 U.S.C. § 1023, is to apprise the DOL of possible violations. The agency has robust investigatory and civil-enforcement power, as well as the authority to refer matters to the Attorney General for criminal investigation. *See* §§ 1132, 1134, 1136. Yet since Plaintiffs' case arises not under ERISA but rather under state tort law, the question remains: were errors in Defendant's audit reports the but-for or substantial cause of a failure by the DOL (or any other agency) to timely uncover, investigate, and correct the subject arrearage?

With respect to the 2011 audit report, the answer is plainly no. Defendant released that report on October 13, 2012. (ECF No. 28–3 at 19.) But at that point, a DOL investigation was already underway, apparently prompted by complaints from Trojan Horse employees. A letter from Trojan Horse attorney Jack Gohn, dated October 26, 2012, and addressed to Traci Vreeland-Rate of LGLLC, indicated that Gohn and Brian Hicks (Plan administrator and

---

[20] Plaintiff Dotzler opined that Defendant "submitted the wrong audits and . . . didn't tell the government how far behind in arrears . . . the contributions were . . . ." (ECF No. 49–3 at 2.) Plaintiff Frantz surmised that Defendant "should have reported [the arrearage] to the government, and the government should have been able to do something about it then." (ECF No. 49–4 at 8.) Plaintiff McMillen assumed that, upon notice of irregularities, "[t]he government" would "step in and correct . . . the matter." (ECF No. 49–5 at 13.) And Plaintiff Miley "relied solely upon the independent auditor to do its due diligence and protect [him] and make sure that the money was accounted for." (ECF No. 49–6 at 2.)

president of Trojan Horse) had met with DOL Wage and Hour Division enforcement personnel at some point during the previous two months and that other federal and state agencies, including the Employee Benefits Security Administration, were inquiring about the arrearage. (ECF No. 52–2 at 2.) Thus, even if Defendant's 2011 report contained misrepresentations or omissions— the Court makes no finding in this regard—such errors cannot be said to have *caused* Plaintiffs' losses, whether directly or indirectly. There was no detrimental failure to apprise federal regulators of the arrearage because they were already aware of it and addressing it.

With respect to the 2010 audit report, released on October 13, 2011 (ECF No. 28–2 at 12), the Court has insufficient information from which it might determine whether this report predated regulatory enforcement action. Given that a party opposing summary judgment "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another," *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985), the Court would be reluctant indeed to set in this case for trial on the bare conjecture that the 2010 report *might* have caught the regulators' attention and that the regulators *might* thereafter have taken swift and definitive action that *might* have stemmed some of Plaintiffs' losses. But the Court need not even indulge such thinking, because Plaintiffs' critique of the 2010 audit report is itself misguided. In their Amended Complaint, Plaintiffs allege that the 2010 report listed a year-end fair value of $1,824,702, whereas Form 5500 listed a fair value of $1,900,604; Plaintiffs add that Defendant "later reported the fair value" as $1,901,143. (ECF No. 38 ¶¶ 53-55.) Plaintiffs evidently believe that these differing figures constitute "negligent representations about PLAN contributions and the fair value of the assets in the PLAN." (*Id.* ¶ 56.) But Plaintiffs are mistaken: a careful study of the documents shows that the numbers reconcile. Both the Form 5500 *and* the audit report list year-end net assets of $1,901,143. (ECF No. 28–2 at 4, 13.) The

$1,824,702 figure represents year-end net assets less a $539 participant-contribution receivable and $75,902 notes receivable from participants (*i.e.*, from loans that participants took out against their accrued benefits). These receivables are reported consistently on the Form 5500 *and* the audit report. (*Id.* at 3, 13.) As for the $1,900,604 figure, this number (reported on the Schedule of Assets supplementing Form 5500, Schedule H, Part IV, Line 4(i)), simply represents net assets less the $539 participant-contribution receivable. It appears that Plaintiffs, in their haste to thrust tort liability on Defendant, misread the relevant documents.[21]

In the end, because Plaintiffs have not shown and cannot prove causation-in-fact,[22] Defendant is entitled to summary judgment with respect to Plaintiffs' professional negligence claim. And because Plaintiffs' negligent misrepresentation claim also failed, the Court will GRANT Defendant's Motion for Summary Judgment (ECF No. 41) and DENY AS MOOT Plaintiffs' pending Motion for Class Certification (ECF No. 53).

---

[21] The Court is aware that Plaintiffs' would-be expert, Bruce D. Pingree, opined that the 2010 documents also fail to identify delinquent employer contributions for that year. (ECF No. 29–1 at 3.) But Plaintiffs neither allege a 2010 employer-contribution arrearage in their Amended Complaint nor supply corroborating evidence of any such arrearage; as discussed above, the discrepancy they believe that they identified for 2010 stems from a simple misreading of the documents. By contrast, it is undisputed that Trojan Horse owed over $700,000 to the Plan as of year-end 2011—a figure that is reflected on both the Form 5500 and the audit report for 2011. (*See* ECF No. 28–3 at 10, 20.)

[22] In a declaration attached to Plaintiffs' opposition memorandum, filed on September 3, 2015, Plaintiffs' counsel Steven Bennett Blau indicated that Plaintiffs required additional time to depose auditors Traci Vreeland-Rate and Jerry Herskovitz, both of which depositions had been scheduled for mid-September. (ECF No. 49–1 at 2 & No. 50–1 at 5.) Attorney Blau seems to suggest that Defendant's Motion for Summary Judgment, filed as it was before the conclusion of these depositions, was premature. The Court disagrees. While the testimony of Vreeland-Rate and Herskovitz might have been relevant to an analysis of the professional duty of care, the Court seriously doubts whether such testimony could have any bearing on the dispositive issue addressed in this Memorandum, *i.e.*, tort causation. Moreover, Plaintiffs had an additional opportunity—through their Motion for Class Certification—to bring to the Court's attention any relevant testimony from those late depositions. Nothing in Plaintiffs' subsequent briefs or exhibits undercuts the Court's conclusion that Plaintiffs have failed to establish a triable question of fact on the crucial element of causation.

*IV.*   *Conclusion*

For the foregoing reasons, an Order shall enter DENYING Plaintiffs' Motion for Reconsideration (ECF No. 50); DENYING AS MOOT Plaintiffs' Motion for Class Certification (ECF No. 53); and GRANTING Defendant's Motion for Summary Judgment (ECF No. 41).

DATED this 28th day of January, 2016.

BY THE COURT:

/s/
James K. Bredar
United States District Judge